Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

# UNITED STATES DISTRICT COURT

for the

**Southern District of Ohio** ▾

**Eastern Division**

FILED
RICHARD W. NAGEL
CLERK OF COURT

2023 MAR -9 PM 2:29

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
EAST. DIV. COLUMBUS

**TEVIN JONES**

_____

**Plaintiff(s)**
*(Write the full name of each plaintiff who is filing this complaint.
If the names of all the plaintiffs cannot fit in the space above,
please write "see attached" in the space and attach an additional
page with the full list of names.)*

–v–

**ENTERPRISE HOLDINGS, INC,
EAN HOLDINGS, LLC, dba Enterprise Rent-A-Car
JASON PEARSON, JOHN BOWRON**

_____

**Defendant(s)**
*(Write the full name of each defendant who is being sued. If the
names of all the defendants cannot fit in the space above, please
write "see attached" in the space and attach an additional page
with the full list of names.)*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. **2:23 CV 0920**

*(to be filled in by the Clerk's Office)*

Jury Trial: *(check one)* ☑ Yes ☐ No

JUDGE MORRISON

MAGISTRATE JUDGE VASCURA

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION

### I. The Parties to This Complaint

#### A. The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Tevin Jones |
| Street Address | 1608 E Fulton St |
| City and County | Columbus, Franklin County |
| State and Zip Code | Ohio, 43205 |
| Telephone Number | (419) 908-2724 |
| E-mail Address | TJONES@INVICTAREALTYLLC.COM |

#### B. The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

Defendant No. 1

| | |
|---|---|
| Name | ENTERPRISE HOLDINGS, INC |
| Job or Title *(if known)* | |
| Street Address | 600 Corporate Park DR |
| City and County | Saint Louis, |
| State and Zip Code | Missouri, 63105 |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 2

| | |
|---|---|
| Name | EAN HOLDINGS, LLC dba ENTERPRISE RENT-A-CAR |
| Job or Title *(if known)* | |
| Street Address | 4600 McAuley Place, Suite 510 |
| City and County | Cincinnati, Hamilton |
| State and Zip Code | Ohio, 45242 |
| Telephone Number | - |
| E-mail Address *(if known)* | |

Defendant No. 3

| | |
|---|---|
| Name | JASON PEARSON |
| Job or Title *(if known)* | Area Rental Manager |
| Street Address | 4600 McAuley Place, Suite 510 |
| City and County | Cincinnati, Hamilton |
| State and Zip Code | Ohio, 45242 |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 4

| | |
|---|---|
| Name | JOHN BOWRON |
| Job or Title *(if known)* | Human Resources Generalist |
| Street Address | 4600 McAuley Place, Suite 510 |
| City and County | Cincinnati, Hamilton |
| State and Zip Code | Ohio, 45242 |
| Telephone Number | |
| E-mail Address *(if known)* | |

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

### C. Place of Employment

The address at which I sought employment or was employed by the defendant(s) is

| | |
|---|---|
| Name | Rental Car Center -- John Glenn Intl. Airport (CMH) |
| Street Address | 4106 International Gateway |
| City and County | Columbus, Franklin County |
| State and Zip Code | Ohio, 43219 |
| Telephone Number | (844) 913-0741 |

### II. Basis for Jurisdiction

This action is brought for discrimination in employment pursuant to *(check all that apply)*:

☑ Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).

*(Note: In order to bring suit in federal district court under Title VII, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☐ Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 to 634.

*(Note: In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file a charge with the Equal Employment Opportunity Commission.)*

☑ Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117.

*(Note: In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☐ Other federal law *(specify the federal law)*:

Family and Medical Leave Act of 1993, as codified 29 U.S.C. §§ 2611 to 2617

☐ Relevant state law *(specify, if known)*:

Ohio Revised Code § 4112.02

☐ Relevant city or county law *(specify, if known)*:

Columbus City Code § 2331.03

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

## III.    Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A.    The discriminatory conduct of which I complain in this action includes *(check all that apply)*:

☐    Failure to hire me.

☐    Termination of my employment.

☑    Failure to promote me.

☑    Failure to accommodate my disability.

☐    Unequal terms and conditions of my employment.

☐    Retaliation.

☐    Other acts *(specify)*:

*(Note:  Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.)*

B.    It is my best recollection that the alleged discriminatory acts occurred on date(s)

On or about:  2/11/2022, 3/15/2022, 10/17/2022

C.    I believe that defendant(s) *(check one)*:

☐    is/are still committing these acts against me.

☑    is/are not still committing these acts against me.

D.    Defendant(s) discriminated against me based on my *(check all that apply and explain)*:

☑    race          Black

☐    color

☐    gender/sex

☐    religion

☐    national origin

☐    age *(year of birth)*          *(only when asserting a claim of age discrimination.)*

☑    disability or perceived disability *(specify disability)*

Chronic Migraines

E.    The facts of my case are as follows.  Attach additional pages if needed.

Pro Se 7 (Rev. 12/16) Complaint for Employment Discrimination

See attachments

*(Note: As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, or the charge filed with the relevant state or city human rights division.)*

## IV. Exhaustion of Federal Administrative Remedies

A.   It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding the defendant's alleged discriminatory conduct on *(date)*
11/25/2022

B.   The Equal Employment Opportunity Commission *(check one)*:

☐   has not issued a Notice of Right to Sue letter.

☑   issued a Notice of Right to Sue letter, which I received on *(date)*   12/12/2022   .

*(Note: Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.)*

C.   Only litigants alleging age discrimination must answer this question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding the defendant's alleged discriminatory conduct *(check one)*:

☐   60 days or more have elapsed.

☐   less than 60 days have elapsed.

## V. Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

See attachments

## VI.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:        03/09/2023

Signature of Plaintiff

Printed Name of Plaintiff        TEVIN JONES

### B.    For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION AT COLUMBUS

| | |
|---|---|
| **TEVIN JONES**<br>1608 E Fulton St<br>Columbus, OH 43205<br><br>     *Plaintiff,*<br><br>  vs.<br><br>**ENTERPRISE HOLDINGS, INC**<br>600 Corporate Park DR<br>Saint Louis, MO, 63105<br><br>   and,<br><br>**EAN HOLDINGS, LLC d/b/a**<br>**Enterprise Rent-A-Car**<br>4600 McAuley Place, Suite 510<br>Cincinnati, OH, 45242<br><br>   and,<br><br>**JOHN BOWRON**<br>**c/o EAN Holdings, LLC**<br>4600 McAuley Place, Suite 510<br>Cincinnati, OH, 45242<br><br>   and,<br><br>**JASON PEARSON**<br>**c/o EAN Holdings, LLC**<br>4600 McAuley Place, Suite 510<br>Cincinnati, OH, 45242<br><br>     *Defendants.* | **2:23 CV 0920**<br><br>CASE NO.: ___JUDGE MORRISON___<br><br>MAGISTRATE JUDGE VASCURA<br><br>**JURY TRIAL DEMANDED** |

Page 1

## **COMPLAINT**

## I. **INTRODUCTION**

Plaintiff, Tevin Jones ("Jones"), brings this action against his former employers, Enterprise Holdings, Inc., and EAN Holdings, LLC dba Enterprise Rent-A-Car (collectively, "Enterprise"), Jason Pearson ("Pearson"), and John Bowron ("Bowron"). Jones, who is Black, was hired by Enterprise in 2014. During the first two (2) years of his employment, Jones worked at the Polaris branch in Lewis Center Ohio as a Vehicle Service Agent ("VSA"), a non customer-facing position. Then in 2016 Jones laterally transferred to the John Glenn International Airport ("CMH") branch where in 2017, he would earn a promotion to Customer Service Representative ("CSR"), a customer-facing position.

During the next five (5) years, Jones would become one of the most knowledgeable and trusted employees at the branch by continuously learning how to serve customers to complete satisfaction as well as being a team player. Jones would also become a key employee for his managers to depend on by assisting them in managing, training, and developing their staff members including his managers and assisting them in managing the fleet of rental vehicles. In or about the summer of 2018, Jones would be denied the opportunity to compete for a promotion to the fleet team under the title of Fleet Coordinator by then Area Rental Manager ("ARM"), David Clunk ("Clunk") who is white.

Enterprise would experience a tremendous growth in business at CMH after acquiring two (2) additional rental car brands, National Car Rental and Alamo Rent-A-Car, in or about April 2018 and also through an increase in air travelers moving through CMH annually in the years following the acquisition. Jones would receive his next promotion in 2019 to Emerald Club

Page 2

Specialist which would see him becoming more involved with the management of the fleet, fleet production, and management of the production staff, which Jones believed would lead him to earning his desired promotion to the fleet team. All of Jones's upward career advancement would stop in February 2022 and March 2022 when Pearson had the opportunity to open two new positions on the fleet team but denied Jones the opportunity to compete for those positions.

In June 2022, Jones began suffering from daily migraines which caused him to send an email to Bowron in which he described his medical problems in detail and also complained about harassment that he was receiving from Pearson. Bowron instructed Jones to set up Family and Medical Leave Act ("FMLA") paperwork for the migraines and did nothing about Jones's complaints of harassment that he was receiving from Pearson. On or about October 11th, 2022, Pearson walked up to Jones and forced a confrontation with him. Later that day Jones was placed on paid leave pending the results of a Human Resources investigation led by Bowron into the incident between Jones and Pearson. Enterprise terminated Jones's employment gratuitously via phone call. Despite Jones's request for an explanation of the reason behind his termination, Enterprise refused to provide him with any documentation of the supposed misconduct that the company claimed justified its sudden decision to terminate Jones's employment.

Jones now brings claims pursuant to Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. §2000e, et seq. ("Title VII"); the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12112 to 12117, et seq. ("ADA"); the Family and Medical Leave Act of 1993, as amended 29 U.S.C. §§ 2611 to 2617, et seq. ("FMLA"); and the Ohio Fair Employment Practices Act, as amended 41 R.C. § 4112.02, et seq. ("FEPA"). Accordingly, Jones seeks all damages, including economic damages, non-economic damages, compensatory damages, punitive damages, and all other available relief this Court deems appropriate.

## II. PARTIES

1.      Jones, who is black, is an individual and citizen of Franklin County, who resides in Columbus, Ohio.

2.      Defendant Enterprise Holdings, Inc., is a private holding company organized under the laws of the State of Missouri and is headquartered at 600 Corporate Park Drive, St. Louis, Missouri 63105.

3.      Defendant EAN Holdings, LLC is a wholly owned subsidiary of Enterprise Holdings, Inc. organized under the laws of the State of Delaware and maintains its principal place of business at 4600 McAuley Place Suite 510, Cincinnati Ohio 45242.

4.      The operations of Enterprise are substantively consolidated. Examples of Enterprise' consolidated operations include, without limitation, the following:

> a.  Enterprise Holdings, Inc. controls and directs certain of EAN Holdings, LLC's business operations;
>
> b.  Enterprise Holdings, Inc. controls and directs certain of EAN Holdings, LLC's policies, including, without limitation, personnel and human resources policies;
>
> c.  EAN Holdings, LLC disseminates information and written materials to employees and other third-parties bearing the logo of Enterprise Holdings, Inc;
>
> d.  Employees of EAN Holdings, LLC routinely interact with employees of Enterprise Holdings, Inc;

5.      At all relevant times, Enterprise Holdings, Inc., and EAN Holdings, LLC have acted as a single employer, joint employers, and/or alter egos.

6.      Enterprise is engaged in an industry affecting interstate commerce that regularly does business in the State of Ohio and with entities and individuals in the State of Ohio and in the City of Columbus. Enterprise also employs residents of the State of Ohio and the City of Columbus.

7.      At all relevant times, Enterprise acted by and through their authorized agents, servants, workmen, and/or employees acting within the course and scope of their employment with Enterprise and in furtherance of Enterprises' business.

8.      At all relevant times, Enterprise employed fifteen (15) or more employees.

9.      At all relevant times, Enterprise employed four (4) or more individuals in the State of Ohio, including in the City of Columbus.

10.     At all relevant times, Enterprise acted as "employers" within the meaning of the statutes forming the basis of this matter.

11.     At all relevant times, Jones was an "employee" of Enterprise within the meaning of the statutes forming the basis of this matter.

12.     Upon information and belief, Defendant Jason Pearson resides in Ohio, and at all times relevant, was a supervisor and/or manager at Enterprise, and/or was an individual acting directly or indirectly in the interest of Enterprise.

13.     Pearson was an employer within the meaning of Ohio R.C. 4112.01(A)(2).

14.     Pearson is white.

15.     Upon information and belief, Defendant John Bowron resides in Ohio, and at all times relevant, was a supervisor and/or manager at Enterprise, and/or was an individual acting directly or indirectly in the interest of Enterprise.

16.     Bowron was an employer within the meaning of Ohio R.C. 4112.01(A)(2).

Page 5

17.     Bowron is white.

## III. JURISDICTION AND VENUE

18.     The causes of action that form the bases of this matter arise under Title VII, ADA, FMLA, and the FEPA.

19.     All the material alleged in this Complaint occurred in Franklin County, Ohio.

20.     Further, Enterprise conducts business in Franklin County, Ohio.

21.     The District Court has jurisdiction over Count I (Title VII) pursuant to 42 U.S.C. §2000e-5 and 28 U.S.C. §1331.

22.     The District Court has jurisdiction over Count II (ADA) pursuant to 28 U.S.C. §1331.

23.     The District Court has jurisdiction over Count III (FMLA) pursuant to 28 U.S.C. §1331.

24.     The District Court has supplemental jurisdiction over Count IV (FEPA) pursuant to 28 U.S.C. §1367.

25.     Venue is proper in the District Court under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claim occurred within this District.

26.     On or about November 25, 2022, Jones filed a Charge of Discrimination with the Equal Employment Opportunity Commision ("EEOC") complaining of the acts of discrimination alleged herein. This Charge was cross-filed with the Ohio Civil Rights Commision ("OCRC"). Attached hereto, incorporated herein, and marked as "Exhibit 1" is a true and correct copy of the EEOC Complaint (with personal identifying information redacted).

27.     On or about December 12, 2022, the EEOC issued to Jones a Notice of Rights to Sue. Attached hereto, incorporated herein, and marked as "Exhibit 2" is a true and correct copy

of that Notice (with personal identifying information redacted).

28.    Jones has fully complied with all administrative prerequisites for the commencement of this action.

## IV. FACTS

29.    Enterprise is a business which operates various automobile-related ventures including automobile rental, leasing, and sales.

30.    Enterprise is a business that only promotes from within.

31.    Jones was employed by Enterprise at CMH located at 4106 International Gateway, Columbus, Ohio 43219.

32.    In or about August 2014 Jones started as VSA at the Polaris Branch then located at 8933 S Old State Rd, Lewis Center, Ohio 43035.

33.    In or about July 2016 Jones laterally transferred to the CMH branch then located at 4600 International Gateway, Columbus, Ohio 43219.

34.    As a VSA at CMH Jones would quickly earn a reputation as being one of the hardest working and dependable employees at the branch by helping the managers serve customers, tend to the fleet, and helping the customer-facing staff with the closing duties of the branch at the end of business each day.

35.    All of the duties described in the previous line were things that weren't in Jones's job description at that time and were duties that Jones would complete after his actual job duties were complete for the day.

36.    Jones would garner many compliments and praise from his managers and other customer-facing employees for his hard word and always helping out when needed, earning him the nickname of "The 6th Man".

37.     This would lead to Jones's then ARM Clunk giving Jones a promotion in or about October 2017 to a customer facing position of CSR.

38.     During Jones's tenure at CMH, July 2016 through October 2022, he would be the only non-customer facing employee to receive a promotion out of over 150 different non-customer facing employees that worked at CMH during this time.

39.     As a CSR Jones would begin to learn how to use Enterprise's various proprietary software applications which Enterprise uses to facilitate rental car transactions and manage the rental car fleet.

40.     Jones would begin to show a particular interest in learning every aspect of fleet management with his career goal at that time to earn a promotion to become a member of the fleet team.

41.     In or about April 2018 Enterprise, through an acquisition, expanded its operating brands at CMH from one (1) brand, Enterprise Rent-A-Car ("ERAC"), to three brands (3), ERAC, National Car Rental ("National"), and Alamo Rent-A-Car ("Alamo").

42.     National/Alamo was wholly acquired by Enterprise in or about 2007. Prior to this acquisition, the National/Alamo brands were operated mainly as a franchise business model where individual franchisees would own and operate individual locations.

43.      When the acquisition occurred in 2007, Enterprise ended the franchise program for National/Alamo and began to buyout or acquire each franchised location from the franchisees.

44.     Although Enterprise Owned all three (3) brands, ERAC, National/Alamo, following the acquisition in 2018, ERAC would still operate with its own lot, customers, employees, and production facilities while National/Alamo would still operate with its own lot,

customers, employees, and production facilities.

45. Production/fleet production in airport rental car businesses refers to the cleaning, fueling, servicing, washing, and staging of returned rental cars to prepare them to be rerented.

46. The only significant changes at that time would be that all three brands would share the same fleet of rental vehicles, before the acquisition there were two separate fleets of vehicles, and all vehicles would now be mechanically serviced at National/Alamo's off site service center known as "BASE".

47. When Enterprise completed the acquisition of National/Alamo at CMH in or about April 2018, it greatly increased Enterprise's rental car market share at CMH, customer base, brand recognition, fleet size, employee count, reservation count, gross revenue, and net profit.

48. In or about the summer of 2018 a position of Fleet Coordinator opened up due to the tremendous growth in business Enterprise experienced at the CMH branch within just four (4) months of the acquisition.

49. When this position opened up, Jones as well as many of his managers and coworkers were excited because Jones had already been performing the duties of a Fleet Coordinator on a nearly daily basis.

50. Jones had included comments in his annual performance reviews expressing his desire to join the fleet team which then ARM Clunk read, and Jones's managers went to Clunk and recommended Jones for the position.

51. Jones would be denied the opportunity to compete for this position by Clunk.

52. Clunk instead promoted Dom Pizzuro ("Pizzuro"), a white male to the position.

53. Jones along with his managers would help train Pizzuro.

54.     Dom Pizzuro would fail to perform in the position and would demote himself back to his old position after only one (1) month of being a Fleet Coordinator.

55.     During the years of 2017, 2018, and Early 2019, Jones primarily was scheduled to work weekends, and nights (CMH closed at midnight or later depending on the number of delayed flights).

56.     Jones would earn a new nickname during this time of "OTT Tev" (short for Over Time Tevin), due to Jones frequently coming in to work earlier than scheduled, staying later than scheduled, and coming in on many of his days off to help out.

57.     The two highest ranking employees at the branch during this time ARM Clunk and Branch Rental Manager ("BRM") Aaron Martin ("Martin") primarily had schedules of Monday through Friday 8AM to 5PM.

58.     With CMH being Enterprise's only airport/high volume location in Columbus, OH, it was known as a training branch where employees would come to gain experience necessary for them to earn their next promotion.

59.     Being a high volume branch, employees would come to CMH with the goal of being promoted out or transferred out of CMH within three (3) to twelve (12) months because if they stayed any longer they would typically start to experience burnout or a high level of stress related to working at a high volume airport rental car branch.

60.     CMH would typically average four (4) to five (5) Assistant Branch Rental Managers ("ABRM") that worked under Clunk and Martin who shared the responsibilities of running the branch during weekends and nights when Clunk and Martin were off and who were expected to work at the branch for six (6) to twelve (12) months.

61.     Approximately one third (⅓) of CMH's business was conducted during weekends

and nights when the ABRMs and Jones were working.

62.     With the ABRMs frequently getting promoted or transferring out, Jones was often one of the most if not the most knowledgeable and capable employees in the branch when Clunk and Martin weren't there.

63.     Clunk and Martin would frequently tell the ABRMs and other customer-facing employees during training to go to Jones whenever they had problems with customers, managing employees, Enterprise's software applications, or had questions that Clunk and Martin weren't around to answer.

64.     Clunk and Martin would also frequently pull Jones to the side on Mondays to ask him how the weekend went, how the ABRMs performed, and his suggestions for improvement.

65.     In or about March 2019 Martin would receive a promotion which would see him transfer from BRM of ERAC at CMH to one (1) of two (2) BRMs of National/Alamo at CMH leaving his position unfilled.

66.     In or about March 2019 Keith Roberts "Roberts" would be promoted to Martin's unfilled position of BRM of ERAC at CMH.

67.     Roberts didn't have any airport experience so he would have a steeper learning curve than most managers when starting his new role at CMH.

68.     Martin as well as other managers informed Roberts that Jones was one of the most knowledgeable employees that he could lean on to help him get adjusted to his new role and Jones would teach Roberts dozens of important things over the course of several weeks to help him become successful in this role.

69.     In or about April 2019 Jones would earn a promotion to Emerald Club Specialist ("ECS") which would see him officially transition from the Enterprise side of CMH to the

National/Alamo side of the branch.

70.     Jones didn't receive a raise which typically happens each time Enterprise promotes an employee.

71.     Jones never received the Emerald Club Scorecard monthly bonus that came with the new position. Multiple managers of Jones did receive their monthly Scorecard bonus.

72.     As ECS Jones would begin to work closely with Darnell Jenkins ("Jenkins") who was a (1) of two (2) BRMs of National/Alamo as he was the main employee who actively managed the fleet and the production staff on a daily basis.

73.     Jones would essentially become second in command to Jenkins in being a trusted employee that Jenkins could rely on to perform in his absence, perform fleet management related tasks, and help manage the production staff which Jenkins was managing alone until Jones became the ECS.

74.     In or about January 2020, Jones was approached by then Group Rental Manager, Gregory Sklenar ("Sklenar"), who told Jones that then BRMs of National/Alamo Martin and Jenkins informed him of the positive impact that Jones's hard work had been having on the branch, particularly how much Jones was contributing to fleet production and fleet management.

75.     Sklenar also told Jones that he was in the process of creating a new fleet position, Production Manager, for National/Alamo and Martin and Jenkins had recommended Jones to him for that position.

76.     In March of 2020 the COVID-19 Pandemic began which negatively impacted Enterprise's global operations which are largely based on the trends of the travel industry.

77.     Jones Would be furloughed along with every non-manager Enterprise employee at CMH in or about late March 2020 due to a significant decline in passengers traveling through

CMH during this time and this would stop the potential promotion that Jones could have received to Production Manager because the need was no longer there.

78.     In or about March 2020 to June 2020, Enterprise significantly changed the management structure of CMH by temporarily moving the ARM Clunk to another rental area in the city of Columbus, creating a new position of Tri-Brand Branch Manager (Tri-BBM") to fill the roll of ARM, decreasing the number of BRMs from three (3) to one (1), and decreasing the number of ABRMs from approximately eight (8) to approximately three (3).

79.     These changes would see Damon Belcher ("Belcher") come to CMH as the Tri-BBM with his duties being handling the customer facing areas of the branch including the customer facing staff with the help of the three (3) ABRMs, while Jenkins would be the sole BRM with his duties being managing the entire fleet, managing fleet production, and managing the production staff with no help from Belcher or the ABRMs.

80.     Enterprise would also "consolidate the area" at CMH which would be the first time that all three brands operated as one (1) entity with one (1) set of cars, employees, and customers as a way to save money and better meet the needs of the customers with the majority of the staff still being on furlough due to the pandemic.

81.     From in or about July 2020 to February 2022, Jones would be the only employee who actively helped Jenkins perform his duties even though he wasn't a manager and there was a minimum of approximately five (5) to eight (8) managers working at CMH during this time.

82.     In or about the summer of 2021 Belcher and then Clunk would ultimately have their employment with Enterprise terminated separately to great embarrassment to their direct superiors.

83.     In or about June 2021, shortly after Belcher's termination, Enterprise opened up

the position of ARM at CMH and Pearson was promoted to that position.

84.     Jones met Pearson for the first time in or about July 2021, during which they had a conversation about Jones's background and history with the company.

85.     During this meeting, Jones would tell Pearson for the first time that prior to the pandemic, Jones was on a pathway to earning a promotion to Production Manager and Jones would explain to Pearson that he had been working towards this promotion.

86.     On or about September 1st, 2021, Enterprise moved its operations to the new CMH Consolidated Rental Auto Center ("ConRAC") which is a 900,000 (nine hundred thousand) square foot, 134 (One hundred thirty-four) million dollar, four (4) story dedicated rental car center with nine different rental car brands.

87.     This would be the first time that the CMH branch would have to move its location in approximately two decades and it was a monumental undertaking.

88.     Jones played a key role in ensuring a smooth transition between the old facility and the new ConRAC.

89.     Jenkins was the only manager in charge of the production staff (approximately 2/3rds of the entire staff) so it was his sole responsibility to teach the production staff how to navigate the facility using access cards, how to use the new gas pumps, how to use the new car washes, and help them with any issues/concerns that they had about the new facility amongst various other things that were new to them.

90.     Jones would be the only employee to assist Jenkins with helping the production staff become familiar with the new work environment as well as solving their problems/concerns even though Jones wasn't a manager and there were approximately 8-10 managers at CMH at that time.

Page 14

91.     On the first day in the new facility, Jones noticed that Enterprise left a large amount of needed supplies and equipment at the old facility. So he began to drive minivans and pickup trucks to the old facility to retrieve loads of items that were left behind. Over the course of 1 (one) month, Jones brought thousands of dollars worth of equipment and supplies that were left behind and would have otherwise been thrown in the trash.

92.     These items varied from office necessities such as copy paper, pens, and staplers, to tools such as jacks, tool boxes, air compressors, and portable jump boxes, to expensive chemicals used to wash/clean cars and more.

93.     In or about September 2021, Pearson asked Jones to come to his office to discuss his Bureau of Motor Vehicles check that Enterprise conducts on all employees annually.

94.     During this meeting, Pearson would ask Jones whether he wanted to work up front (customer-facing) or work in the back (non customer-facing production role), to which Jones responded that he wanted to work in the back and he explained to Pearson for the 2nd time of his goal of being promoted to manager or member of the fleet team.

95.     In or about September 2021, Jenkins would inform Jones that he would have to take a weekend off to attend his daughter's wedding out of town, with this weekend being Friday October 1st through Sunday October 3rd.

96.     Jenkins would tell Jones that he spoke with Pearson and they agreed that Pearson would assume all of Jenkins's duties as Pearson was Jenkins's only superior that worked in the branch.

97.     Jones would ask Jenkins multiple times if he could take the weekend off because he didn't feel that Pearson could handle Jenkins's responsibilities.

98.     Jones's request would be denied due to Jenkins expressing to him that he didn't

feel comfortable taking time off without Jones being present in his absence.

99.    On Friday October 1st, 2021, Jones arrived at the branch at or about 6am (one hour prior to the branch opening), to be prepared to help Pearson in any way that he needed.

100.   Jones met with Pearson about 1 (one) hour after arriving at the branch and they discussed the needs of the business that day and what the expected challenges were for the day.

101.   Pearson told Jones that he would be assuming Jenkins's responsibilities for the day and he asked Jones what Jenkins would typically be doing in the morning and also asked Jones about the employees schedules.

102.   Pearson told Jones that he would be in the Quick Turnaround Area (QTA) all day because that was where Jenkins spent his entire day managing production.

103.   After Pearson was in the QTA for approximately 30 (thirty) minutes, he went to the front of the branch leaving Jones in charge of production.

104.   At the end of the day Jones worked 13 (thirteen hours) and 13 (thirteen minutes) without taking a lunch break even though he was only scheduled to work 8 (eight) hours.

105.    Jones assumed all of Jenkins duties that day including running production, coming up with the fleet plan, managing the fleet, and managing all of the drivers and auto detailers (⅔ of the staff) because Pearson didn't have the competence to do these tasks himself.

106.   The weekend of Friday October 1st, 2021 through Sunday October 3rd, 2021 would turn out to be one of the busiest weekends at the branch for the entire year of 2021.

107.   Jones was scheduled to work Monday through Friday at this time but with Jenkins off for the weekend and Pearson failing to perform on Friday October 1st, 2021, Jones knew that he would have to manage production on Saturday October 2nd, 2021 and Sunday October 3rd, 2021 which were his scheduled days off.

108.    Before Jones left work on Friday, he talked to the lead auto detailers that would be working on Saturday and told them what the plan was for Saturday and how to execute the plan. He also told them that he would be available by phone all day if they needed help or had any issues.

109.    Jones had spoken with Jenkins earlier in the week and Jones agreed to come in on Sunday even though he was scheduled to be off only to facilitate the movement of the approximately 600 six-hundred returns that were scheduled for Sunday and Jenkins informed him that Pearson would be responsible for all of Jenkins other duties.

110.    On Sunday October 3rd, 2021 Jones showed up to work at or about 6am with the goal of facilitating the movement of cars from the return lane to the roof and BASE and then leaving work as soon as this task was completed.

111.    The first challenge that Jones encountered was that some of the employees who were supposed to come in to help move cars either showed up late or didn't show up at all which led to the return lane becoming increasingly congested and also led to Jones having to call in employees who were scheduled off that day to come in and help for overtime hours.

112.    The next challenge that Jones encountered was that Assistant Manager Benjamin Hale ("Hale") was starting his first day at CMH and Pearson was supposed to be training him but Pearson decided to sit in his office instead of training Hale because Pearson lacked the competence to train Hale.

113.    Hale was the manager in charge of running the pickup counter, greeter booth, exit booths, and any customer issues which were all challenging for Hale because he hadn't used the software that Enterprise uses at its airport branches. Hale only made it through the day by constantly Facetiming Mitchley who was at home enjoying his day off and by constantly asking

Page 17

Jones for help and receiving support from Jones with having the appropriate vehicles that Hale would need for customers who booked speciality vehicles.

114.    The next challenge that Jones faced was around noon when the original driving crew reached the end of their shift, there weren't enough employees left to continue moving cars out of the return lane so Jones had to make a difficult decision to stop the auto detailers from cleaning cars and have them start moving cars out of the return lane to control the congestion of the return lane.

115.    By the end of the day, Jones had facilitated the movement of approximately 250 (two hundred fifty) cars to the roof and a couple dozen out of service cars to Base to maintain enough space in the return lane for customers to continue returning cars while simultaneously ensuring that hundreds of cars got cleaned by the end of the day,

116.    Jones had planned to come in to only facilitate the movement of cars out of the return lane but by the end of the day Jones had managed all the drivers, auto detailers, the entire fleet, fleet production, the return lane, setting the branch up for success on Monday, and helping train a manager (Hale) even though Jones wasn't a manager and he was scheduled to be off on Sunday October 3rd.

117.    All of these duties that Jones did on Friday October 1st and Sunday October 3rd were the duties that Jenkins would do every day and these were duties that Jenkins and Pearson had agreed that Pearson would do in Jenkins absence but due to Pearson lacking the competence that Jenkins and Jones had, Jones had to step in to do Jenkins duties with no help from Pearson or any other manager.

118.    Jones worked a total of 11 (eleven) hours and 21 (twenty-one) minutes on Sunday October 3rd without taking a lunch break and while suffering from a migraine for half of the day.

119.     The weekend of Friday October 1st, 2021 through Sunday October 3rd, 2021 would turn out to be one of the busiest weekends at the branch for the entire year of 2021 and Jones handled production by himself for this entire weekend even though he wasn't a manager and shouldn't have been tasked with managing the entire fleet and 2/3rds of the staff.

120.     In or about October 2021 Jones noticed that his employee title changed from ECS to Automotive Detailer, Jones voiced his opinions on this change to Jenkins because he felt that this was a demotion and knew that it would be hard for him to get promoted with this new title.

121.     In or about the 4th week of November 2021, Jenkins informed Jones that Enterprise wanted all of the production staff to take either Thursday November 25th or Friday November 26th off due to the reservations and returns projected to be lower than normal.

122.     Jenkins planned to work both days (25th & 26th) because he was the only employee in charge of the production staff and the entire rental car fleet but Jones and Jenkins agreed that Jones would work thanksgiving day, thursday the 25th, and take Friday the 26th off and Jenkins would take the Thursday the 25th off and work friday the 26th so Jenkins could enjoy a holiday with his family.

123.     On or about Thanksgiving day, Thursday November 25th, 2021, Jones started the day off by counting all the vehicles in the branch and then reviewing the reservations and returns scheduled for the day to come up with the fleet plan.

124.     Jones spoke with Jenkins after doing the car count and checking the numbers and then Jones spoke with Adam Mitchley ("Mitchley") and Pearson to make them aware of the fleet plan for the day as well as the plan for the following day as there was a large number of vehicles expected to return on Friday November 26th but half of the production staff who would be able to move those cars would be off at Enterprise's request.

125.     Jones managed all the drivers, automotive detailers, and the entire fleet by himself for the entire day while also fulfilling all of Mitchley and Pearson's requests.

126.     Jones didn't receive any assistance from Mitchley or Pearson with performing Jenkin's duties indicating that Mitchley and Pearson had full confidence in Jones managing their staff and fleet even though Jones wasn't a manager.

127.     In or about February 2022 Pearson posted a new position of Fleet Production Supervisor at CMH.

128.     On or about one (1) day before Pearson posted this spot, Jones observed Pearson take Tyler Gibson who is white into an office and talk to him for approximately one (1) and a half hours.

129.     Jones later would discover that the purpose of this meeting was for Pearson to convince Gibson to apply for the new fleet position even though Gibson had no desire apply for the job, Pearson would also invite another white employee that he knew from a local branch to CMH on the same day to convince him to apply for the position.

130.     Jones applied for the position but wasn't allowed to compete for the position because Pearson had the intention of hiring a white person for the job.

131.     After Pearson interviewed the other candidates and selected one of them for the position, Pearson would talk to Jones and tell him that he didn't meet the qualification criteria for the position and Jones would remind him for the third time that he only worked for Enterprise because he had been on a path to become a member of the fleet team or a manager for a few years.

132.     Pearson then told Jones that he had a meeting scheduled with himself, Bowron, and Sklenar, during which they would be discussing another fleet position and that he would tell

Bowron and Sklenar of Jones's desire for a fleet position and he would get back to Jones with the details.

133.     Tyler Gibson ("Gibson") was selected for the Fleet Production Supervisor by Pearson, he failed to perform and less than sixth (6) months into the job, Gibson demoted himself to a lower position away from CMH.

134.     In or about March 2022 Pearson would open a new position of Fleet Logistics Coordinator which Jones didn't apply for because Pearson failed to get back to Jones with the details of the position before and after creating the position and Pearson also put in a specific qualification that disqualified Jones that Jones believed was done intentionally by Pearson.

135.     Peter Smith ("Smith") who is white, was selected for the Fleet Logistics Coordinator position by Pearson, he failed to perform and less than six (6) months into the job, Smith terminated his employment due to the stress and pressure from the job.

136.     Pearson has a history of hiring white employees over equally qualified black employees.

137.     During Pearson's first three (3) months at CMH he had approximately four (4) or five (5) black Level two (2) employees, in October 2022 Pearson had replaced most of the black Level two (2) employees with white Level two (2) employees leaving Jenkins as the only black Level two (2) employee.

138.     In or about June 2022 Jones would begin to experience everyday migraines which would cause him to have an irregular attendance pattern, Pearson would begin to ask Jenkins about Jones's attendance.

139.     This questioning by Pearson made Jones feel unsettled and caused him to write an email to Bowron voicing his concerns about his daily migraines as well as voicing complaints

about Pearson and his harassing behavior towards Jones.

140. Bowron responded to Jones's email by instructing him to have his doctor fill out Family and Medical Leave Act ("FMLA") paperwork which Jones did but Bowron didn't provide any instruction to Jones as to how he was supposed to use the FMLA.

141. Bowron ignored Jones's complaints about Pearson by telling Jones that he would speak to Pearson about Jones's medical problems.

142. On or about Tuesday October 11th, 2022 Pearson and Jones got into a confrontation when Pearson tried to force Jones into a room to talk, Jones tried to avoid the confrontation but Pearson was hovering around Jones's work area as Jones was within minutes of leaving work for the day and then Pearson threatened to call the Police on Jones.

143. Pearson has a history of getting into confrontations with his employees similar to the confrontation between Pearson and Jones.

144. On or about Wednesday October 12th, 2022 Bowron asked Jones for his side of the story of the incident and asked Jones if he would be willing to meet with Pearson the next day to which Jones agreed, Bowron also told Jones that Pearson was his former boss and expressed his opinion of how Pearson is a great boss, a great guy, and how the two have a great relationship.

145. On or about Thursday October 13th, 2022 Bowron canceled the meeting without explanation and asked Jones about Pearson's allegations of threats or words said to Pearson by Jones that made Pearson feel threatened which Jones then denied.

146. On or about Friday October 14th, 2022 Bowron asked Jones again about allegations of threats or or words that would have made Pearson feel threatened which Jones denied again and then proceeded to remind Bowron about his allegations of Pearson threatening

Jones.

147.     Jones was placed on paid leave from the day after the incident with Pearson to the day of Jones's termination, Pearson was never placed on paid leave.

148.     Bowron told Jones that he was conducting an investigation into the incident when in reality Bowron only conducted an investigation into Jones and his alleged actions and words during the incident, Bowron never investigated Pearson or his alleged actions and words because of their close personal relationship and Bowron's loyalty to Pearson as Pearson was his former boss.

149.     Bowron told Jones that he was interviewing multiple witnesses to the incident that heard what Pearson and Jones were saying to each other which is false because there were only four (4) individuals who could have heard what was said (Pearson, Jones, Jenkins and Jeffrey Bender "Bender").

150.     Jenkins was only asked a few questions the day of the incident, so the only other non party to the incident who could have heard what was said was Bender who had received a promotion to level two (2) Fleet Production Supervisor from Pearson a month prior and would have only been loyal to Pearson as he didn't know Jones.

151.     Bowron's investigation and subsequent termination of Jones's employment on or about Monday October 17th, 2022 didn't align with Enterprise's own progressive code of conduct.

152.     Jones never received any disciplinary actions during his eight (8) years and two (2) months of continuous employment with Enterprise.

153.     On or about October 17th, 2022 Jones sent Bowron an email asking for an explanation of his termination or a termination letter which Bowron didn't respond to.

154. On or about November 2nd, 2022 Enterprise rejected Jones's initial application for unemployment insurance ("UI") benefits by claiming that Jones was terminated with cause for violating a policy.

155. On or about November 21, 2022 Enterprise appealed Jones's UI allowance by claiming that Jones was terminated with cause for violating a "reasonable and known policy".

156. The unemployment office decided in favor of Jones over Enterprise in both instances finding that Jones proved that Enterprise fired Jones without just cause.

157. From the time Jones became a CSR in 2017 to the time of Jones's termination from Enterprise in 2022, Jones actively participated in managing, training, and developing well over 100 (one hundred) Enterprise employees while never being a manager and never receiving the continuous corporate training that managers receive from Enterprise.

158. Some of these employee's titles include Interns, Customer Service Representatives, Return Agents, Management Trainees, Management Assistants, Assistant Branch Rental Managers, Branch Managers, Exit Booth Agents, Counter Agents, Drivers, Fleet Coordinators, Temporary Employees, and Automotive Detailers (formerly Vehicle Service Agents).

## V. CAUSES OF ACTION

## COUNT I: FAILURE TO PROMOTE BASED ON RACIAL DISCRIMINATION
## AGAINST ENTERPRISE HOLDINGS INC., AND EAN HOLDINGS, LLC

159. Jones incorporates by reference the foregoing paragraphs as if set forth herein in their entirety.

160. Jones is Black and thus, a member of a protected class under Title VII as codified,

Page 24

42 U.S.C. §§ 2000e to 2000e-17.

161.    Throughout his employment with Enterprise, Jones applied for and/or was qualified for promotions within Enterprise.

162.    On at least two occasions, Jones applied for and/or qualified for, and was considered for Fleet Production Supervisor and Fleet Logistics Coordinator positions at Enterprise locations, yet he was denied the promotion.

163.    For each position to which Jones applied and/or qualified for and was denied promotion, a less-qualified or similarly-qualified individual outside Jones's protected class received the promotion.

164.    Enterprise refused to promote Jones based on his race.

165.    Jones's race was a determinative factor in Enterprise's decision to not promote him.

166.    Enterprise repeatedly violated Title VII 42 U.S.C. §§ 2000e to 2000e-17 when it failed to promote Jones based on his race.

### COUNT II: FAILURE TO ACCOMMODATE DISABILITY

### AGAINST ENTERPRISE HOLDINGS INC., AND EAN HOLDINGS, LLC

167.    Jones incorporates by reference the foregoing paragraphs as if set forth herein in their entirety.

168.    Enterprise is an employer as defined by the ADA of 1990, 42 U.S. Code § 12111(5a).

169.    Jones suffers from a disability, chronic migraines, as defined by the ADA.

170.    Jones was a qualified individual and he was able to perform the essential functions of his job, either with or without reasonable accommodation.

171.     Jones informed Bowron via email and phone call in or about June 2022 that he did not feel comfortable with Pearson knowing any of his medical information.

172.     Bowron disclosed Jones's medical information to Pearson and also encouraged and allowed Pearson to use Jones's medical information that was wrongfully disclosed to him as the reasoning behind Pearson attempting to talk to Jones about his medical condition.

173.     The ADA specifically prohibits the disclosure of medical information except in certain limited situations, which do not include disclosure to coworkers.

174.     Jones notified Enterprise of his disability by obtaining a written letter from his doctor in or about October 2020 and again in or about June 2022 and Enterprise didn't reasonably accommodate it.

175.     Enterprise violated the Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117 when it failed to accommodate his disability.

## COUNT III: INTERFERENCE IN VIOLATION OF FMLA LEAVE
### AGAINST PEARSON AND BOWRON

176.     Jones incorporates by reference the foregoing paragraphs as if set forth herein in their entirety.

177.     Pearson is an employer as defined by the FMLA 1993, 29 U.S.C. §§ 2611(4a).

178.     Bowron is an employer as defined by the FMLA 1993, 29 U.S.C. §§ 2611(4a).

179.     Jones was an eligible employee and eligible for leave under the FMLA.

180.     Bowron failed to provide Jones with any instruction on how Enterprise wanted Jones to use FMLA and Jones's rights under FMLA.

181.     Jones gave proper notice of the need for leave to Enterprise through his direct superior Jenkins who then notified Bowron and Pearson of Jones's leave.

182.     Pearson interfered with Jones's exercise of rights under the FMLA by attempting to force Jones to discuss the details of his medical condition with Pearson.

183.     Bowron interfered with Jones's exercise of rights under the FMLA by terminating his employment with Enterprise for taking leave.

184.     Pearson violated the Family and Medical Leave Act of 1993, as amended 29 U.S.C. §§ 2611 to 2617, et seq. when he interfered with Jones's rights under FMLA.

185.     Bowron violated the Family and Medical Leave Act of 1993, as amended 29 U.S.C. §§ 2611 to 2617, et seq. when he interfered with Jones's rights under FMLA.

## COUNT IV: RACE DISCRIMINATION IN VIOLATION OF FEPA
## AGAINST ENTERPRISE HOLDINGS INC., AND EAN HOLDINGS, LLC

186.     Jones incorporates by reference the foregoing paragraphs as if set forth herein in their entirety.

187.     Jones is Black, and thus, a member of a protected class under Ohio R.C. § 4112.01, *et seq.*

188.     Defendants were employers as defined by R.C. § 4112.01, *et seq.*

189.     Throughout his employment, Jones was fully qualified and capable to perform the essential functions of his job.

190.     Defendants treated Jones differently than other similarly situated, Caucasian employees based on his race.

191.     During his employment, Jones suffered adverse employment actions when he was repeatedly passed over for promotions, discriminated against based on his disability, and ultimately terminated.

192.     Jones was discriminated against and treated differently than his similarly-situated

Caucasian coworkers based on his race (Black).

193.    Defendants violated R.C. § 4112.01, *et seq.* by, discriminating against Jones due to his race.

194.    Defendants violated R.C. § 4112.01, *et seq.* by, among other ways, terminating Jones's employment based upon his race and disability.

195.    Jones's race was a determinative factor in Defendants' decision to terminate his employment.

## VI. **PRAYER FOR RELIEF**

WHEREFORE, Jones seeks damages and legal and equitable relief in connection with Defendants' unlawful conduct, and specifically prays that this Court grant the following relief to Jones by:

(a) Declaring the acts and practices complained of herein to be in violation of Title VII;

(b) Declaring the acts and practices complained of herein to be in violation of the ADA;

(c) Declaring the acts and practices complained of herein to be in violation of the FMLA;

(d) Declaring the acts and practices complained of herein to be in violation of the FEPA;

(e) Enjoining and permanently restraining the violations alleged herein;

(f) Entering judgment against Defendants and in favor of Jones in an amount to be determined;

(g) Awarding compensatory damages to make Jones whole for all lost earnings, earning capacity and benefits, past and future, which Jones has suffered or may suffer as a result of Defendants' unlawful conduct;

(h) Awarding compensatory damages to Jones for past and future pain and suffering, emotional distress, mental anguish, humiliation, and loss of life's pleasures, which Jones has suffered or

may suffer as a result of Defendants' unlawful conduct;

(i) Awarding punitive damages to Jones under Title VII, the ADA, and the FEPA;

(j) Awarding Jones such other damages as are appropriate under Title VII, the ADA, the FMLA, and the FEPA;

(k) Awarding Jones the costs of suit, expert fees and other disbursements; and granting such other and further relief as this Court may deem just, proper, or equitable including other equitable and injunctive relief providing restitution for past violations and preventing future violations.

(l) A positive letter of reference from Enterprise detailing Jones's time working for Enterprise and what Enterprise liked about Jones as an employee.

Dated: <u>March 9th, 2023</u>                                    Respectfully Submitted,

                                                                    *T. J____*

                                                                    Tevin Jones

                                                                    1608 E Fulton St.

                                                                    Columbus, OH 43205

                                                                    (419) 908 2724

                                                                    *Pro Se Plaintiff*